IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LORI MILLER,                          )
                                      )
              Plaintiff,              )
                                      )
        vs                            )    Civil Action No. 09-1537
                                      )    Magistrate Judge Lisa Pupo Lenihan
SHARON REGIONAL HEALTH                )    ECF No. 19
SYSTEM,                               )
                                      )
              Defendant.              )

## MEMORANDUM OPINION

Plaintiff, Lori Miller, brings this employment discrimination action pursuant to the Age

Discrimination in Employment Act, 29 U.S.C. § 621-34 (ADEA) against the Defendant, Sharon

Regional Health System (SRHS). She alleges that, when SRHS terminated her employment as a

Mobile Therapist with the hospital's Behavioral Health Rehabilitative Department on January

28, 2008, it discriminated against her on the basis of her age (49).

Currently pending for resolution is a motion for summary judgment, brought on behalf of

the Defendant. For the reasons that follow, the motion will be granted.

Facts

SRHS is a comprehensive health care system serving the residents of Sharon,

Pennsylvania and surrounding communities. (Compl. ¶ 2.)[1] In addition to inpatient health

services, SRHS offers outpatient Behavioral Health Rehabilitative Services (BHRS), also

referred to as "wraparound" services, to children and families struggling with autism and other

mental health problems. SRHS offers two BHRS programs: the Connections Autism Program,

founded in 1997, serving children with autism spectrum disorders and their families; and the

---

[1]      ECF No. 1.

Foundations Program, in existence since 1996, serving children and families with other mental health diagnoses, including ADHD, depression/bipolar disorder, conduct/oppositional defiant disorder and anxiety disorders. (Marinko Dep. at 7.)[2]

At the time of Plaintiff's hire in 1998, the Connections and Foundations Programs were under different supervisors. Lori Marinko was responsible for the Connections Program, and Don Breneman supervised the Foundations Program. When Don Breneman left the organization in 2003, both programs came under Marinko's supervision. (Miller Dep. at 32;[3] Marinko Dep. at 12-13.) Marinko in turn reported to Sandy Melvin, Director of Outpatient Behavioral Health Services. (Marinko Dep. at 7-8.) Sandy Melvin reported to Charles (Chuck) Hahn, then Vice President of Behavioral Health Services. (Hudock Dep. at 13.)[4]

The BHRS programs employed three levels of professional staff:

a. Therapeutic Support Staff (TSS), a Bachelor's degree level position, the duties of which include one-to-one therapeutic services to clients specific to his or her goals. TSS are supervised by Behavioral Specialist Consultants.

b. Mobile Therapist (MT), a Master's level position providing play therapy, group therapies and one-to-one therapy with clients specific to the client's needs and goals.

c. Behavioral Specialist Consultant (BSC), a Master's level position specializing in behavioral management strategies. Individuals in this position serve as on site evaluators and consultants to the child's treatment team and are responsible for the observation of behaviors, data collection, and development of behavioral modification plans and reporting. The BSC also supervises TSS in the implementation of behavioral modification plans.

(Compl. ¶ 10; Marinko Dep. at 7; ECF No. 19 Ex. A; Marinko Aff. ¶ 3.[5])

---

[2]    Def.'s Mot. Summ. J. (ECF No. 19) Ex. H.
[3]    ECF No. 19 Ex. G.
[4]    ECF No. 19 Ex. K.
[5]    Miller Dep. Ex. 1. Marinko's affidavit was submitted to the EEOC in connection with Plaintiff's charge of discrimination in this case.

<u>Plaintiff's Employment History</u>

Plaintiff was hired as a TSS in the Connections Program on August 3, 1998.  (Miller Dep. at 31; ECF No. 19 Ex. B at Doc. 220000228.)  She began working on her Master's Degree in school counseling while a TSS under Marinko.  At that time, Plaintiff met with Marinko and reviewed the Westminster College Course Catalog with her.  Marinko told her that this coursework would not qualify her for the BSC position.  (Miller Dep. at 86-87; Marinko Aff. ¶ 11.)  Plaintiff admitted that her Master's Degree coursework did not involve behavior modification.  (Miller Dep. at 88.)

Plaintiff applied for and received tuition reimbursement for coursework leading to her Master's Degree.  In her initial application for reimbursement, dated January 11, 2001, she stated that her Master's Degree in counseling would lead to a certification as a BSC.  However, in each subsequent application, Plaintiff stated that her Master's Degree would allow her to move into the MT position.  (Marinko Aff. ¶ 12 & Ex. A; Marinko Dep. at 67.)

When Plaintiff graduated, Marinko and Connie Hart reviewed her transcript and discussed whether she could be a BSC.  Marinko and Hart concluded that she did not qualify for the BSC position.  (Marinko Dep. at 73.)  Plaintiff's Master's Degree, however, did qualify her for the MT position, which was the reason that she transferred from the Connections to the Foundations Program shortly before graduation, and upon graduation began working as an MT. (Miller Dep. at 32, 87; Marinko Dep. at 12.)

Plaintiff obtained her Master's Degree in 2002 and thereafter obtained an MT position under Don Breneman.  (Miller Dep. at 32; Marinko Dep. at 12; ECF No. 23 Ex. 6.)  After Don Breneman left in the summer of 2003, she again came under Marinko's supervision.  Her immediate supervisor at the time of her termination was Anthony (T.J.) Hudock, who became

her immediate supervisor in 2006. (Miller Dep. at 32; Hudock Dep. at 37; Marinko Aff. ¶ 14.) The other two supervisors under Marinko at this time were Lori Hillman and Mike Ross. (Hudock Dep. at 13.)

With the exception of one BSC case temporarily assigned to her at the end of 2007 (discussed below), Plaintiff worked exclusively as an MT after obtaining her Master's Degree. (Miller Dep. at 60-61; Marinko Dep. at 155-57; Hudock Dep. at 37.)

On January 28, 2008, Plaintiff's employment was terminated. (Hudock Dep. at 26-27; Marinko Dep. at 69.) At the time of her termination, Plaintiff was 49 years old. (Novelli Aff. ¶ 2.)[6] Veronica Valiensi, the other MT whose employment was terminated at that time, was 39 years old. (Novelli Aff. ¶ 2.)

The MT and BSC Positions

Although both are Master's level positions, the MT and BSC positions involve different duties and required different skills and educational achievements. MTs provide individual and family psychotherapy to patients and families in non-clinical settings. (ECF No. 19 Ex. A, Doc. 220000017.) The BSC acts primarily as a consultant who works indirectly with clients through the family, teachers and other caregivers. BSCs are responsible for treatment planning, behavior planning, data plan development, data collection and development of applied behavior plans. (Hudock Dep. at 17.) BSCs are responsible for supervising the TSS in the implementation of behavior plans. (ECF No. 19 Ex. A, Doc. 220000006.) MTs do not have supervisory responsibilities.

The parties agree that the BSC position required graduate level coursework in behavior modification, but have different understandings of the number of graduate level credits required.

---

[6]     ECF No. 19 Ex. F.

Up until the date she was terminated, Plaintiff believed the requirement to be three graduate level credits. Plaintiff did not learn that the job required a minimum of nine graduate level credits until the day of her termination. (Miller Dep. at 67.) Plaintiff believed the requirement to be three graduate level credits because Marinko had stated this in meetings in 2003, 2004 and 2005. (Miller Dep. at 64, 122.) Marinko denied telling employees that the requirement was three credits. (Marinko Dep. at 44.) Kelly Lenzi, a BSC who was employed in the Connections Program, also believed that the BSC position required three graduate level credits, based on what she had been told when she was hired in 1998. (Lenzi Dep. at 10-11, 67-68.)[7] Lenzi acknowledged that there would have been no reason for anyone to tell her differently. (Lenzi Dep. at 68.)

According to SRHS, the requirement was three graduate level courses, not three credits. (Hudock Dep. at 40.) In approximately 2000, Don Breneman, together with Connie Hart, developed a Behavioral Specialist Consultant Treatment Manual, which outlined the duties and qualifications for the BSC position. On page 4 of that document, it states that "the BSC must have at least nine graduate hours of learning theory/behavior modification." (Hudock Dep. at 40-41 & Ex. 1; Marinko Dep. at 38-39.)

In 2002, the Commonwealth of Pennsylvania issued Draft Guidelines that called for, among other things, twelve graduate level credit hours in behavior modification to qualify as a BSC. (Marinko Aff. ¶ 10; ECF No. 19 Ex. C.) Based on these documents, Marinko understood SRHS's requirement to be nine to twelve graduate credit hours. (Marinko Dep. at 38.) Marinko acknowledged that SRHS did not require strict adherence to the Draft Guidelines. Rather, in preparation for the Commonwealth's formal adoption of the guidelines, the nine to twelve credit

---

[7]     ECF No. 19 Ex. J.

hour requirement at SRHS could be satisfied through classroom credits or a combination of credits and experience.  (Marinko Dep. at 61-64.)

Marinko recommended to her staff that they take a series of courses in Applied Behavioral Analysis (ABA) offered by Penn State.  (Marinko Aff. ¶ 16.)  Marinko recommended the series of courses because it would satisfy the nine to twelve credit requirement, because SRHS was attempting at the time to "standardize the position," and because she knew from the 2002 Draft Guidelines that this level of education was "going to be the wave of the future." (Marinko Dep. at 20-22; Marinko Aff. ¶ 10.)  Marinko acknowledged that one could work as a BSC without having taken the recommended Penn State courses or any other post-Master's level courses.  (Marinko Dep. at 22.)  Marinko, Lenzi and Erin Bain all completed the series of coursework at Penn State.  (Marinko Dep. at 22.)

Plaintiff acknowledged that, in 2003, Marinko informed the staff about the ABA classes offered by Penn State, and in 2004, she decided to take the first course in the series. (Miller Dep. at 65.)  She told Marinko at the time that she had signed up to take one of the courses offered by Penn State.  (Marinko Dep. at 20.)  In December 2004, Plaintiff completed the four-credit course and received a grade of B minus.  (ECF No. 19 Ex. B, Doc. 20000060.)  She never took the remaining courses in the series.  (Miller Dep. at 65.)

Plaintiff's BSC Assignment

In the fall of 2007, Plaintiff received a temporary BSC assignment. (Miller Dep. at 60-61.)  The case to which she was assigned was originally assigned to Tanya Moschillo (age 30) as a BSC case.  When Moschillo took maternity leave, she suggested to Marinko that Plaintiff take over the BSC assignment.  Moschillo informed Marinko that the family did not want anyone new working with their child.  Moschillo suggested that Plaintiff take over the assignment because

she was already familiar with the client.  (Marinko Dep. at 154-55; ECF No. 19 Ex. E, Doc. 220000285.)

Marinko agreed to allow Plaintiff to work on the case under close supervision of T.J. Hudock.  (Marinko Dep. at 155.)  Moschillo's maternity leave began on October 5, 2007. (Novelli Aff. ¶ 3.)  When the family requested that BSC services end on December 28, 2007, Plaintiff's BSC assignment terminated and the case transitioned back to Moschillo.  (Marinko Dep. at 28, 156.)  Plaintiff notes that Marinko said "I don't think that [her assignment ended] because of the family wishing to discontinue services."  (Marinko Dep. at 28.)[8]

Plaintiff did not receive another BSC assignment after services ended on that case, and Marinko did not intend to give her another assignment. (Marinko Dep. at 156.)  When Plaintiff worked on the one BSC case to which she was assigned, she signed her name as a BSC and her services were billed as such. (Marinko Dep. at 25-26.)

<u>Fiscal Problems Lead to the Elimination of All Dedicated MT Positions</u>

During the latter part of 2007, BHRS ran into severe financial difficulties, for a number of reasons. One reason was the decline in the demand for MT services, because managed care organizations such as Value Behavioral Health reduced the number of BHRS hours they would authorize.  (Marinko Dep. at 99-100; Marinko Aff. ¶ 5.)

---

[8]    Defendant states that Marinko related that, based on verbal reports she received from Hudock, she understood that Plaintiff did not display a high level of skill or competence in the BSC position.  (Docket No. 21 ¶ 44.)  However, at Marinko's deposition, when she was asked about Plaintiff's performance as a BSC, Marinko initially stated "I don't know," then Defendant's counsel asked if she had stated in her affidavit for the EEOC that she had heard from Hudock that Plaintiff did not do well in the BSC position and Marinko "recalled" that she had.  (Marinko Dep. at 29-30.)  Yet Defendant has produced this affidavit in its materials (Miller Dep. Ex. 1) and nowhere in the document does Marinko refer to Plaintiff's performance in the BSC position.  In addition, at his deposition, Hudock stated that he did not recall how Plaintiff performed in her BSC assignment.  (Hudock Dep. at 19-20, 34.)  Therefore, the Court cannot accept this statement of fact as supported by the record.

At a meeting in October 2007, Marinko told staff that the agency was in a "financial mess" due to problems with productivity. Marinko noted that there were unbilled hours, meaning hours that had been authorized by third party payors that were not or could not be provided. (Miller Dep. at 135-36.)

Marinko also stated in the summer of 2007 after attending a budget meeting that there were too many people at the higher end of the pay scale. (Miller Dep. at 138-39.) Plaintiff understood Marinko to mean that there were people who had been there longer and therefore being paid more, and that people needed to make their billable hours. (Miller Dep. at 146-48.)

Lenzi also heard Marinko comment that the Department was not making money because there were people who had worked there a long time and whose salaries kept going up, while the reimbursement rates remained the same. (Lenzi Dep. at 37.) Professional staff were expected to bill a minimum of 24 hours in order to be paid for a 40-hour week. (Miller Dep. at 16.) Marinko also had a mandate from SRHS administration to reduce her professional staff by three full-time equivalent (FTE) positions, in order to more closely match staffing with case volume. (Marinko Dep. at 85, 114; Davidson Dep. at 23.[9])

Marinko and others, including Sandy Melvin, Chuck Hahn, various people from the financial department, John Davidson (Vice President of Human Resources), along with supervisors T.J. Hudock, Lori Hillman and Mike Ross discussed various ways to improve productivity and respond to the administrative mandate. (Marinko Dep. at 86; Hudock Dep. at 26-27.) One of the topics that emerged from those discussions was the difficulty that arose from having employees who could only fulfill the MT function and the need to have people who could fulfill both BSC and MT roles. (Hudock Dep. at 26-27; Marinko Dep. at 80.)

---

[9] ECF No. 19 Ex. I.

Ultimately, the decision was made to eliminate all the dedicated MT positions and to eliminate three full-time equivalent positions. (Marinko Dep. at 69-70, 86; Marinko Aff. ¶ 4.) At the time, there were five employees potentially affected by the decision: Jay Hewitt, Michelle Multari, Tanya Moschillo, Lori Miller and Veronica Valiensi. (Marinko Aff. ¶¶ 5-7.)

Of these, Hewitt and Multari were over 40 at the time. Hewitt, in fact was 55, six years older than Plaintiff, and Multari was 42. (ECF No. 19 Ex. D; Novelli Aff. ¶ 2.)

Marinko's team determined that Plaintiff and Veronica Valiensi did not qualify for the BSC position by virtue of their training or experience. (Marinko Dep. at 79, 156-57; Marinko Aff. ¶ 8.) At the time, Veronica Valiensi was 39 years old. (Marinko Dep. at 157; Miller Dep. at 110; ECF No. 19 Ex. D; Novelli Aff. ¶ 2.)

Based on information provided to SRHS by the respective employees, the following are the years of birth and ages as of January 28, 2008 of each of the above-named individuals:

| Document No. | Name | Year of Birth | Age as of 1/28/08 |
|---|---|---|---|
| 220000312 | Tanya Moschillo | 1977 | 30 |
| 220000425 | Michele Multari | 1966 | 42 |
| 220000520 | Veronica Valiensi | 1969 | 39 |
| 220000635 | Jay Hewitt | 1953 | 55 |
| 220000228 | Lori Miller | 1959 | 49 |

(ECF No. 19 Exs. A, D; Novelli Aff. ¶ 2.)

Plaintiff's Meeting with Marinko

Marinko had made it known to BHRS staff that layoffs would be forthcoming. Marinko initially told employees that seven people were going to be laid off for financial reasons. Within

a couple of weeks of that announcement, however, Marinko said that two people would lose their jobs and also announced that SRHS was going to eliminate the "MT only" position. (Lenzi Dep. at 39.)

Marinko stated at the regular supervision meeting held on the Tuesday before Plaintiff's termination that there were going to be layoffs. Marinko stated that employees who did not receive a call by Friday would not be laid off. (Miller Dep. at 75.). Marinko made the same statement to another supervision group the day before. (Miller Dep. at 76.)

After hearing this news, Plaintiff telephoned SRHS's Human Resources Department and someone there told her that the Hospital usually lays people off by seniority and follows State Guidelines with regard to qualifications for other positions within the health system. (Miller Dep. at 77-78.) Marinko called Plaintiff on Thursday of that week and told her that she would meet with her on Friday. (Miller Dep. at 68.)

Plaintiff already knew the purpose of the meeting, and had prepared notes for the purpose of supporting her claim that she should be considered a BSC. (Miller Dep. at 73-75, 81 & Ex. 2.) On Friday, January 25, 2008, Plaintiff met with Marinko and T.J. Hudock, her immediate supervisor. (Miller Dep. at 67.)

According to Plaintiff, Marinko stated at that meeting that the BSC position required three graduate-level credits, and when Plaintiff showed her the proof that she had taken the first of the series of courses at Penn State, Marinko terminated the interview and told her to come back on Monday. (Miller Dep. at 67-68.) Plaintiff stated that she had previously given proof of her coursework to Hudock, but Hudock indicated that he did not recall her ever giving him anything like that. (Hudock Dep. at 31.)

Following the meeting, Marinko sent the following email message to John Davidson:

Met with Lori Miller this am stating that we were eliminating MT position.  Right after I stated that we were eliminating MT positions and that she was going to be part of the lay off … she immediately produced a 4-credit ABA grade slip and argued that she should stay and qualify as a BSC(?).  She argued about having the same degree as Michelle Multari and Tanya Moschillo … Michelle's degree is not the same as Lori's.  Tanya's may be but the coursework has changed over the years to be more stringent … don't have Tanya's transcript yet.  Lori's degree is a 39 school counseling degree.  We found Lori's transcript and reviewed …we couldn't really see how she could qualify as a BSC. (Lori, of course, stated that I told them they only needed _one_ course, which I would not have done, I would have talked to with the supervision group about doing ABA coursework if a flyer for it came across my desk).  Michelle Multari's transcript is from a different school and is a community counseling degree from YSU (so it is clinical in nature).  Michelle's shows research which involves tracking, measurements and assessment techniques which is what you need for data collection.  Tanya will be the issue … I fudged my response to her about Tanya.  Worst case scenario would be Tanya, Lori and Veronica go vs. if they have BSC qualification or not their titles are MT.  Michelle is the most senior and qualifies for BSC and we did ask her to change, although did not change her gold form title.

(Pl.'s App. Ex. 9.)[10]  Plaintiff quotes from portions of this message, particularly the section in which Marinko states that she "fudged" her response to her about Moschillo.  However, as Defendant notes, the context makes clear that she did not have Moschillo's transcript in front of her as they spoke.  She later reviewed Moschillo's transcript, as noted in the following email sent to Carol Novelli, personnel records custodian for SRHS, on July 17, 2008:

This is the email I have from that time frame.  Tanya had ordered a transcript but it wasn't it when I had met with Lori but I believed her to be telling me the truth about her courses.  She brought in the transcript later and she did have: measurements and assessments (3 credits), research (3 credits), and two other courses that deal with behavior modification (human development and counseling techniques … each for 3 credits).

(Pl.'s App. Ex. 9.)

After terminating the Friday meeting, Marinko went to see Sandy Melvin. When asked why she went to see Sandy Melvin instead of continuing with the termination if the requirement was nine to twelve credits, Marinko responded: "Because it's a really hard thing to fire

10    ECF No. 23.

somebody… and so if there was any possible way to give somebody the benefit of the doubt, I was going to try it." (Marinko Dep. at 89.) Sandy Melvin and Marinko each spoke to John Davidson, Vice President of Human Resources, concerning Plaintiff's situation. (Marinko Dep. at 90-91.) Davidson asked Marinko whether Plaintiff's classwork made her eligible to be a BSC. Marinko indicated that it did not. Davidson therefore instructed Marinko to go ahead with the termination. (Davidson Dep. at 26-27; Marinko Dep. at 92; Marinko Aff. ¶ 18.)

Plaintiff's Termination from Employment

Marinko met with Plaintiff again the following Monday, at which time she informed her that the requirement was nine credits. (Miller Dep. at 67.) Marinko did not re-review Plaintiff's Master's degree transcript at the time, because she had already reviewed it at the time Plaintiff was hired by the Foundations Program. (Marinko Dep. at 74.) Marinko understood that Plaintiff's practicum was oriented toward Counseling. She got this understanding from casual conversations with her at the time. (Marinko Dep. at 69; Marinko Aff. ¶ 13.) Marinko stated that she did not know whether Plaintiff had ever developed a token economy, developed behavior plans to deal with disruptive students, trained teachers in behavior management programs or developed programs for recording and tracking data. (Marinko Dep. at 71-72.)

In addition to Plaintiff and Veronica Valiensi who were let go, Tanya Moschillo and Barb Marsch voluntarily agreed to reduce their hours to half time in order to eliminate the third FTE position. (Davidson Dep. at 32; Marinko Aff. ¶ 9.) As noted above, Moschillo was 30 years old. Barb Marsch was 43 years old. (Novelli Aff. ¶ 2.)

Plaintiff's last day of employment was January 28, 2008. (Miller Dep. at 82.) After her discharge, she met personally with Sandy Melvin. Plaintiff told Melvin that she felt she was qualified as a BSC. She also suggested to Melvin that:

> I don't know if this is because—you know, she [Marinko] is retaliating because I know this about her. And she said what? And I said: Well, I know that she is using this office to also supplement or work with her other office. And Sandy had me explain, and she seemed to know, but she just kept it right there…"

(Miller Dep. at 43.) Plaintiff went on to state that she was one of the people who found out, in 2006 or 2007, that Marinko was involved with another agency, and had people at the Hospital who also worked for that agency. (Miller Dep. at 44-45.) This issue is discussed further below.

Plaintiff also met with John Davidson, who states that she never complained at the meeting that she thought she was being terminated because of her age. (Davidson Dep. at 48.) He states that she never complained to him at any time that anything that happened during her employment at SRHS involved an issue of age discrimination. (Davidson Dep. at 48.) Plaintiff concedes this point, but states that her belief that she had been discriminated against did not present itself more fully until after this meeting with Davidson. (Miller Dep. at 46-47.) She has not explained what this statement means.

SHRS notes that Plaintiff never complained to anyone at SRHS prior to retaining a lawyer that her termination had anything to do with her age. (Miller Dep. at 100.) Plaintiff concedes this point as well, but again states her belief that she had been discriminated against did not present itself more fully until after this meeting with Davidson. (Miller Dep. at 46-47.) Plaintiff had no firsthand knowledge of any other acts of discrimination at SRHS. (Miller Dep. at 107-08.)

Plaintiff points out that, since being terminated from SRHS, she obtained new employment with a different agency, working as a BSC. (Miller Dep. at 14-15.) Defendant responds that this does not mean she was qualified for the same position at SRHS and observes that she claims to be making less at her new position than she did at SRHS. (Miller Dep. at 16-22.)

<u>Procedural History</u>

Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC). On August 21, 2009, the EEOC issued a Notice of Right to Sue Letter. (Compl. Ex. 1.)

Plaintiff filed a complaint in this Court on November 18, 2009 (ECF No. 1). The complaint alleges that Defendant discriminated against her on the basis of her age, in violation of the ADEA. On March 4, 2010, the parties filed consents and the case was assigned to the undersigned for all purposes on March 5, 2010 (ECF Nos. 13-14). On September 15, 2010, Defendant filed a motion for summary judgment.

<u>Standard of Review</u>

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. <u>Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty- Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

<u>ADEA Claim</u>

The ADEA provides that it is an unlawful employment practice for an employer to discharge or discriminate against any individual because of such individual's age if that individual is over 40.  29 U.S.C. §§ 623(a), 631(a).  In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792, 802 (1973) and refined in <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 252 53 (1981).  <u>Chipollini v. Spencer Gifts, Inc.</u>, 814 F.2d 893, 897 (3d Cir. 1987) (en banc).

As the Court of Appeals for the Third Circuit has stated:

> The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court.  It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action...

<u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).

The Court of Appeals has indicated that, to state a prima facie case of age discrimination, a plaintiff must establish that he is at least 40 years of age, that he is qualified for the position, that he suffered an adverse employment decision and that he was replaced by a sufficiently younger person to create an inference of age discrimination.  <u>Showalter v. University of Pittsburgh Med. Ctr.</u>, 190 F.3d 231, 234 (3d Cir. 1999) (citation omitted).  "However, where an employee is terminated during a RIF, the fourth element of the prima facie case becomes whether the employer retained employees who do not belong to the protected class."  <u>Tomasso v. Boeing Co.</u>, 445 F.3d 702, 706 n.4 (3d Cir. 2006) (citation omitted).

If the employee presents a prima facie case of discrimination, the employer must

"articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."

McDonnell Douglas, 411 U.S. at 802. If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination. Id. at 804. The Court of Appeals has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

Defendant argues that: 1) assuming that Plaintiff can state a prima facie case of age discrimination, it has proffered a legitimate, non-discriminatory reason for her termination (a reduction in force which eliminated all dedicated MT positions) and she has failed to present evidence from which the trier of fact could conclude that this reason was a pretext for unlawful age discrimination by merely arguing that Moschillo was treated more favorably than she was; and 2) she has not demonstrated pretext by asserting that Marinko favored some employees over others because bad management, favoritism and cronyism do not constitute age discrimination.

Plaintiff responds that: 1) a genuine issue of material fact exists as to whether she was qualified for the BSC position and much of the decision-making process involving her and Moschillo was based on Markinko's subjective interpretations; and 2) she has presented evidence that Marinko categorized employees into favored and disfavored groups based on their ages.

Defendant's Proffered Reason and Plaintiff's Evidence of Pretext

Defendant does not argue that Plaintiff cannot establish a prima facie case of age discrimination and the record would allow for this conclusion: she was over 40, was qualified for

her job as an MT, and was terminated while Moschillo, an employee not in the protected class, was not.  Thus, the burden of production shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's termination.  Defendant cites the RIF and its decision to eliminate three MT-dedicated positions, which it accomplished by terminating Plaintiff and Veronica Valiensi and reducing the hours of Tanya Moschillo and Barb Marsch.  Defendant has thus satisfied its relatively light burden of production.  Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997).

Plaintiff argues that this proffered reason is a pretext for unlawful discrimination and points to Moschillo, a younger employee, who she claims received more favorable treatment.  In addition, she argues that Marinko had animus against older employees, putting them into her "disfavored" group.  In other words, Plaintiff proceeds along "Fuentes prong one" by arguing that she has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason.  Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).  She also proceeds along "Fuentes prong two" by arguing that Defendant's own evidence "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  Keller, 130 F.3d at 1111.

Plaintiff's Fuentes Prong One Evidence

Plaintiff's Fuentes prong one evidence consists of her contention that she had the same qualifications as Moschillo, a younger employee who was not terminated in the RIF.  The parties vigorously dispute what Plaintiff's qualifications were, how they were subjectively viewed by Marinko and how they compared to Moschillo's qualifications.

Marinko states that, although Moschillo and Plaintiff had obtained the same degree from

the same school, she determined that Moschillo was qualified for the BSC position based on the additional coursework and on-the-job training she had received. Moschillo had a three-credit course in research and a six-credit internship that was strongly behavior based. (Marinko Dep. at 49-54.) Marinko explains that:

> Although Ms. Moschillo earned the same degree as Ms. Miller, her coursework differed from Ms. Miller's particularly as it pertained to the practicum and internship courses. While Ms. Miller's practicum focused on career and school counseling, Ms. Moschillo's included behavioral aspects, such as developing a token economy, developing behavior plans to deal with disruptive students, training teachers in behavior management and recording and tracking behavioral data. This training mirrors what [BSCs] do on a daily basis. This training, combined with Ms. Moschillo's coursework in research and measurement and evaluation in my opinion qualified her for the BSC position.

(Marinko Aff. ¶ 15 & Ex. B.)

Plaintiff states that she had taken the same two courses as Moschillo as part of her Master's work at Westminster College, for a total of six credits in behavioral modification as part of her Master's. (ECF No. 23 Exs. 6, 7.) She also took four credits of post-Master's behavioral modification classes through Penn State, for a minimum of ten credit hours of behavioral modification, which was in excess of the nine credit hours that SRHS contends were required to qualify as a BSC. She notes that, at the time of her termination, Moschillo had not taken any post-Master's classes. (Marinko Dep. at 45.)

Defendant responds that, if Plaintiff had ten credits in behavior modification based on Marinko's information, then Moschillo already had twelve. (ECF No. 23 Ex. 9.) Defendant also notes that the email by Marinko to which Plaintiff refers actually states "the coursework has changed over the years to be more stringent" (ECF No. 23 Ex. 9), and that, in addition to the 12 credits, Moschillo also had a six-credit internship that Marinko described as being behavior-based. (Marinko Dep. at 49-54.) Moreover, the email noted that, if Moschillo had not met the

qualifications, she would have been terminated as well.

Defendant states that Plaintiff had not taken the three-credit research course or the six-credit internship. (Marinko Dep. Ex. 1.) Moschillo had also studied the materials in what Marinko referred to as the "BSC Binder," which totaled 15 hours of training, and had another 15 hours of training as a result of viewing the ABA videos published by Penn State. (Marinko Dep. at 55.) Anyone who started training as a BSC was required to read the BSC Binder and meet with a supervisor, and Moschillo's completion of the Binder and videos, coupled with her nine credits, further bolstered Marinko's assessment of Moschillo as capable of performing the BSC job. (Marinko Dep. at 56-57.)

Plaintiff responds that the videos that Moschillo would have watched were the same or essentially the same as the videos that as she herself would have watched as part of her Penn State coursework. (Miller Aff. ¶ 1.)[11] Further, Plaintiff states that she also consulted the BSC binders for information specific to the issues of her client when she worked her BSC assignment in 2007. (Miller Aff. ¶ 2.) Defendant notes that Plaintiff does not state that she completed the binders, as Moschillo did, but only "read those portions of the BSC binders that were specific to the issues for my client in that BSC assignment."

Plaintiff notes that, even after Moschillo completed her Master's in 2005, her Performance Evaluations continued to categorize Moschillo as an MT. (ECF No. 23 Ex. 7) Defendant responds that Moschillo did not work exclusively as an MT and was responsible for the BSC case that Plaintiff inherited when Moschillo went on maternity leave in October 2007.

Marinko admitted that she never performed a side-by-side comparison of Plaintiff's and Moschillo's transcripts. (Marinko Dep. at 78.) However, she did review them separately.

---

[11]     ECF No. 23 Ex. 5.

SRHS states that Plaintiff does not have any evidence to dispute that three of these employees, Hewitt, Moschillo and Multari, were qualified for the BSC position. (Miller Dep. at 62, 109-110.) Plaintiff responds that, while SRHS deemed Hewitt, Moschillo and Multari to be qualified for the BSC position, their qualification was due to the way in which the credits for their graduate-level coursework were interpreted by Marinko. (Marinko Dep. at 55-59, 61-64.) Moschillo was deemed to be qualified only through Marinko's subjective interpretation of Moschillo's past coursework. (Marinko Dep. at 51-57.) Marinko was unsure as to whether Multari met the requirements, but stated that "[i]f she fell short, once again, she was with Jay Hewitt under breadth of experience and number of years, because she had a significant number of years of doing behavior and mental health work." (Marinko Dep. at 95-96.) Further, Moschillo had not taken any post-Master's classes as Plaintiff had done. (Marinko Dep. at 45.)

The Court need not resolve this factual question for the following reasons. First, an employer's honest mistake does not constitute evidence of discrimination. As the Court of Appeals for the Third Circuit has stated: "To discredit the employer's proffered reason … the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765. Thus, even if Marinko was mistaken in her conclusion that Plaintiff did not have enough credits to qualify as a BSC, this evidence alone would be insufficient to demonstrate that her termination constituted age discrimination.

Plaintiff argues that Defendant has changed its position from the one articulated when she was terminated and at the EEOC (namely that she did not have enough credits to qualify as a BSC) to a new reason (namely that Moschillo had more credits than she did). "Substantial

changes over time in [an] employer's proffered reason for its employment decision support a finding of pretext." Christian Legal Soc. Chapter Univ. of Calif., Hastings College of Law v. Martinez, 130 S.Ct. 2971, 3017 (2010) (citations omitted). See also Abramson v. William Paterson College of N.J., 260 F.3d 265, 284 (3d Cir. 2001).

However, that principle has no application in this case. Defendant's legitimate, non-discriminatory reason for its action remains that a RIF occurred and the MT-dedicated positions were eliminated. Defendant is merely responding to Plaintiff's argument that she possessed the exact same qualifications to be a BSC as Moschillo did by pointing out that, even giving Plaintiff the additional credits she claims to have accumulated, Moschillo would also have accumulated these credits and would still have had more than she did.

The second (and more important) reason why the Court need not resolve the factual dispute about Plaintiff's qualifications is that she has selectively identified Moschillo and conveniently ignored the rest of the situation. She has not addressed the fact that Jay Hewitt (age 55) was retained in the RIF, the fact that Michelle Multari (age 42) was retained, the fact that Veronica Valiensi (age 39) was terminated[12] or the fact that Barb Marsch, who voluntarily gave up half of her position (as did Moschillo) in order to retain her employment, was 43. Viewed as a whole, the evidence does not suggest age discrimination. On the contrary, it presents an age-neutral situation entirely consistent with Defendant's explanation that the decision was made based on whether the individuals qualified for the BSC position.

The Court of Appeals has held that a plaintiff "cannot selectively choose a comparator"

---

[12]     In her Supplement to Defendant's Statement of Material Facts Not in Dispute, Plaintiff inexplicably refers to Valiensi as a member of the disfavored group. (ECF No. 24 ¶ 31.) For purposes of the ADEA, Valiensi (age 39 at the time) was not an older employee. Moreover, as discussed in the text below, Plaintiff has not demonstrated that Marinko's "disfavored" group was synonymous with "older employees."

in order to satisfy her burden of demonstrating that similarly situated persons were treated differently.  Simpson v. Kay Jewelers, Inc., 142 F.3d 639, 645 (3d Cir. 1998).  In addition, "the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action."  Id. at 647.  Plaintiff cannot show pretext by focusing exclusively on SRHS's differential treatment of Moschillo while ignoring two older employees who were retained, a younger employee who was let go and an older employee who reduced her hours and was retained.  Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 322 (3d Cir. 2000).  Nor can she rely on her own opinion about how Marinko should have weighed her courses and experiences versus Moschillo's.  Simpson, 142 F.3d at 647.

In addition, Plaintiff's "conclusion" that SRHS effectively conceded that she was qualified for the BSC position when it assigned her temporarily to fill in for Moschillo while Moschillo was on maternity leave (and then gave her no further BSC assignments thereafter) is not entitled to any weight.  Defendant has explained that the assignment was temporary, that it was done to meet the needs of the family that did not want to introduce a new person working with their child and that Plaintiff was monitored closely by her supervisor, which is not typical. (Marinko Dep. at 155.)

Plaintiff's Fuentes prong one evidence is insufficient to establish a genuine issue of material fact as to whether Defendant's proffered reason is a pretext for unlawful age discrimination.

### Plaintiff's Fuentes Prong Two Evidence

Plaintiff's Fuentes prong two evidence consists of various accounts purporting to demonstrate that Marinko had discriminatory animus toward older employees.  According to Plaintiff, Marinko would tell people that there were not enough cases and reduce their status

from full-time (40 hours per week or 80 hours per pay period) to part-time, or 32/64, while other employees had more than full-time caseloads. (Miller Dep. at 35.) She admitted, however, that her hours were never reduced. (Miller Dep. at 36.) Plaintiff also acknowledged that such reductions happened Hospital-wide, and that the Health System had a right to adjust hours to match caseloads. (Miller Dep. at 36-37.) Moreover, Plaintiff gave this as an example of when Marinko was "untruthful" and did not state that the people affected were older employees, much less name them individually.

Plaintiff states that, at other times, Marinko would say that there was no mileage reimbursement for the month and then found out later that some people had gotten mileage checks. (Miller Dep. at 35.) Plaintiff admitted that she had no specific information as to who received mileage reimbursements and who did not. (Miller Dep. at 38.) Nevertheless, she was certain that some mileage reimbursements were not made. (Miller Dep. at 38.)

The RBC Issue[13]

Plaintiff also felt that Marinko was "dishonest" because she was involved in a similar business venture in Meadville, PA. (Miller Dep. at 39.) According to Plaintiff, Marinko interviewed Plaintiff's future daughter-in-law for a TSS position at SRHS and ended up hiring her at the company in Meadville. (Miller Dep. at 39.) Lenzi also cited Marinko's involvement in the Crawford County venture as an illustration of her unethical practices. Lenzi stated that Marinko allowed people who worked for both agencies to complete work for the Crawford County agency on SRHS time. Lenzi refused to identify the people involved because some of them still worked at SRHS. (Lenzi Dep. at 14-15.)

Marinko states that she, Chuck Hahn and an individual named Mike Stern owned a

---

13 Both parties discuss this issue at length in their briefs so the Court feels compelled to address it However, it is not clear what, if anything, this has to do with Plaintiff's claim of age discrimination.

company known as Regional Behavioral Consultants (RBC), which was located in Crawford County, Pennsylvania. (Marinko Dep. at 134.) Marinko did not feel that RBC was in competition with SRHS because it operated in Crawford County and SRHS had no programs in that county. (Marinko Dep. at 135.) However, when Marinko's involvement in RBC became known to SRHS management, Marinko was informed by John Davidson and SRHS President John Zidansek that it would be looked upon unfavorably if she continued. Marinko decided to get out of that business at that point. (Marinko Dep. at 136; Davidson Dep. at 5, 39.)

The issue of Marinko's involvement with RBC persisted, because periodically employees of BHRS would complain that Marinko and other employees of SRHS were still involved in that business. (Davidson Dep. at 39.) SRHS management investigated these complaints, which were never found to be true. (Davidson Dep. at 40-41.)

Plaintiff herself never complained about Marinko's involvement with RBC until after her termination. (Miller Dep. at 42.) At that time, she complained to a "human resource man" that she felt she was being unfairly let go and that Marinko had done other things that were unethical towards the Hospital. (Miller Dep. at 42.) Although Plaintiff could not identify the person she met with as John Davidson, Davidson recalled meeting with her shortly after her termination and recalled that she had complained about Marinko's involvement with RBC. (Davidson Dep. at 28-29, 44-46.)

"Disappearing" Employees

Plaintiff thought that Marinko was "targeting people who were older," because she "started to notice a pattern occurring within the clinical. There weren't many women my age." (Miller Dep. at 46-47.) When asked for specifics, Plaintiff stated:

> I did not see anyone hired at the clinical level her [Marinko's] age while I was there. The fact that the women who were over her age slowly disappeared, and we

kept hiring new, younger women and a couple men, but mostly women, during the time period I was there. So you know, if you see it – you know.

(Miller Dep. at 48.)[14]

Plaintiff admitted that she did not know who had applied for clinical positions, did not know anything about the selection process and was not sure if there were any older employees who had applied who were not selected.  (Miller Dep. at 48.)  SRHS indicates that, in 2007, there were no new hires at the MT or BSC level. (Marinko Dep. at 114-15.)

Plaintiff also acknowledged that she had no information as to why women older than Marinko "disappeared."  (Miller Dep. at 49.)  When asked to identify the older women at the clinical level who were discharged, she could identify only two, Roxanne Krepps and Melinda Collmus.  (Miller Dep. at 50-53.)  Plaintiff admitted that she did not know for sure why Roxanne Krepps was terminated, did not think at the time that it had anything to do with her age and, apart from the fact that Krepps was over 40, did not have any facts would support a conclusion that Krepps had been terminated because of her age.  (Miller Dep. at 50-51.)  She believed that Melinda Collmus "pointed out" under the Hospital's Disciplinary Code.  (Miller Dep. at 52.)  When asked whether she had any facts to indicate that Collmus' termination had anything to do with her age, she responded: "I can't give you any facts other than she's not there." (Miller Dep. at 52.)  According to Marinko, Melinda Collmus and Roxanne Krepps were terminated for performance reasons.  (Marinko Dep. at 143-45.)

Plaintiff admitted that she had no evidence that anyone at the TSS level had been terminated because of their age. (Miller Dep. at 54.)  Jay Hewitt, Roxanne Krepps, Margaret Augustine Williams and Melinda Collmus all discussed with Plaintiff the fact that they did not have enough cases. (Miller Dep. at 124-25.)

---

[14]     By "clinical level," she meant MTs and BSCs (Miller Dep. at 53).

According to Plaintiff, Margaret Augustine Williams had been a full-time employee who went part-time due to family issues, then moved to a different place of employment because she did not have enough cases. (Miller Dep. at 102-03.) Plaintiff knew that Williams had obtained a full-time job elsewhere. (Miller Dep. at 142.) Williams was a BSC in the Foundations Department who resigned prior to Plaintiff s departure. (Marinko Dep. at 143.)

Lenzi's Evidence

Kelly Lenzi, a BSC who worked under Marinko for nine years, did not feel that Marinko was a good manager, and described Marinko as "evil, vindictive, unprofessional, unethical, probably the most horrible person I have ever experienced in my entire lifetime." (Lenzi Dep. at 13.) No place in the deposition, however, does Lenzi state that these personality traits were directed solely toward workers over 40 years of age. According to Lenzi, Marinko would treat staff differently by assigning cases to staff she liked and by taking those employees on two or three hour lunch meetings at a restaurant, while employees she did not like would go to meetings and "get yelled at the whole time." (Lenzi Dep. at 16.) She also stated that, when Marinko took over the Foundations Program after Don Breneman left, she told everyone working for her in the Connections Program that she "hated everybody in Foundations." (Lenzi Dep. at 26-27.)

When Marinko took over the Foundations Program, the Master's level people in that Program included Jay Hewitt, Kathleen Moser, Roxanne Krepps, Margaret Augustine Williams, Melinda Collmus and Tim Woge. (Miller Dep. at 118-19.)

Lenzi described the Foundations staff as generally older than the Connections staff. (Lenzi Dep. at 56.) She admitted, however, that she had no evidence that Marinko did not like the people in Foundations because of their ages. (Lenzi Dep. at 69-70.)

Marinko's position was eliminated on June 25, 2009. (Marinko Dep. at 31-32.) Of the

people who worked in the Foundations Program when Marinko took it over, there were four Master's level staff still there when Marinko was terminated: Jay Hewitt, Michelle Multari, Colleen DeJulia and Mary Beth Vogel.  (Lenzi Dep. at 56-57.)  Of these, Jay Hewitt and Michelle Multari were over 40.  (Lenzi Dep. at 70.)

According to Lenzi, the Master's level staff that Marinko liked included Chrissy Tompkins (age 37 as of 1/28/08), Megan Klingensmith (29), Marcy Campbell (33), Genesis Mertz (30), Lisa Young (29) and Jen Mariano (29).  (Lenzi Dep. at 16; Novelli Aff. ¶ 2.)

Lenzi identified the people Marinko "tolerated" as Tanya Moschillo (30), Michelle Multari (42), Rick Weirick (34), Barb Marsch (sometimes) (43), Jay Hewitt (sometimes) (55), Lindsay Biondi (31), Karen Nord (27) and Colleen DeJulia (36).  (Lenzi Dep. at 18.)

According to Lenzi, Marinko did not like Lenzi (39), Lori Miller (49), Erin Bain (29), Veronica Valiensi (39) and Mary Beth Vogel (34).  (Lenzi Dep. at 19-21.)  Of these, Plaintiff was the only employee who was over 40 as of January 28, 2008, the date of her termination.

When asked how her working relationship with Marinko was, however, Plaintiff responded: "I thought it was fine. I – if somebody asked me to do something and I always did it." (Miller Dep. at 33.)  She denied having any disputes of significance with Marinko when she worked for her. (Miller Dep. at 33.)  Plaintiff responds that the extent and veracity of Marinko's discrimination did not become apparent until she had been terminated and had an opportunity for reflection. (Miller Dep. at 46-47.)

Marinko likewise described Plaintiff as an "okay employee" who "did her job as assigned." (Marinko Dep. at 17.)   Plaintiff points out that she received positive performance reviews.  (ECF No. 23 Ex. 6.)  Defendant agrees that she was not terminated for performance

reasons and states that her evaluations are therefore immaterial[15]

Lenzi did not know the reason that Marinko supposedly liked some employees and disliked others, but stated that: "It depended on how much you brown nosed, I guess." (Lenzi Dep. at 22.) Lenzi observed further that:

> It just seemed to me that the longer you were there, the longer you had experiences with her, the more she began to dislike you. I think she was a very dysfunctional person, and as I stated before, she cycled very quickly, and as time went on, the more kind of experiences that she had with you, the more her kind of hate, dislike towards you grew…

(Lenzi Dep. at 31.) She also stated "I can't pinpoint it to one reason as to why she started to dislike somebody. There's just so many." (Lenzi Dep. at 31-32.)

Lenzi filed what she called a "sex discrimination" complaint against SRHS because Marinko did not immediately return her to full-time status when she returned from maternity leave. (Lenzi Dep. at 45.) After filing the complaint, Lenzi met with Sandy Melvin and John Davidson, and within a couple of hours the matter was resolved to her satisfaction. (Lenzi Dep. at 45.) Apart from this one complaint, which Davidson identified as an FMLA issue, there were no other complaints of discrimination in the Behavioral Health Department under Marinko's tenure. (Davidson Dep. at 46-47.)

In August 2008, approximately eight months after Plaintiff had been terminated, Lenzi and others made various complaints to management concerning Marinko. (Lenzi Dep. at 49.) At that time, Lenzi met one-on-one with John Davidson and told him "everything I knew" about Marinko. (Lenzi Dep. at 49.) Lenzi never complained to Davidson that Marinko treated people differently because of their age or that Marinko disliked Plaintiff because of her age. (Lenzi

---

[15]    Defendant cites Hudock's deposition for his assessment of Plaintiff's performance as an MT. Because the performance reviews (which are positive) are in the record and because Defendant states that it did not terminate Plaintiff's employment for performance reasons, the Court will not review this testimony.

Dep. at 70-71.)

Defendant notes that, for almost the entire time she identified herself as a member of the group of employees that Marinko did not like, Lenzi, who was born in 1968, was under 40. (Lenzi Dep. at 6, 71-72.)  Lenzi had no evidence that Plaintiff's termination had anything to do with her age.  (Lenzi Dep. at 72.)

<u>Affidavits of Other Employees</u>

Plaintiff has also submitted affidavits from four former SRHS employees, who state that Marinko favored certain groups of employees over other groups of employees, and that the favored group "tended to be comprised of younger employees." (Mapleton Aff. ¶ 5; Scafede Aff. ¶ 4; Konter Aff. ¶ 3; Fagley Aff.  ¶ 6.)[16]  According to these individuals, the disfavored group faced harsher treatment from Marinko than their younger colleagues in terms of their willingness to work extra shifts and their conformity to policies relating to the reporting of absences. (Konter Aff. ¶ 5; Scafede Aff. ¶ 7.)  They state that Marinko implemented a system of assigning cases which resulted in the younger employees being able to bill more hours due to less travel requirements. This made the younger employees appear to be the most productive. (Konter Aff. ¶ 7.)  Defendant responds that these affidavits are devoid of supporting details and that the affiants were under the age of 40 when these events occurred.[17]

Part of Sharon Regional's rationale in eliminating positions was, according to Marinko,

---

[16]     ECF No. 23 Exs. 1-4.

[17]     To the extent that Defendant is suggesting that the affiants cannot testify to these matters because they were all under the age of 40 at the time of the events in question, the Court rejects this unsupported argument.  At the same time, the Court cannot accept Plaintiff's counter-argument that "the affidavits are actually more credible coming from persons who were under 40, as the younger persons are not within the protected class and, therefore, have nothing to gain by testifying that they observed Marinko favor younger employees."  (ECF No. 27 at 3.)  The affiants clearly indicate that they were members of Marinko's "disfavored" group, regardless of their ages.  As explained in the text, the affidavits may be considered, but they do not advance Plaintiff's case.

"to increase productivity." (Marinko Dep. at 85.) Marinko stated in the summer of 2007 that there were too many people at the high end of the pay scale. (Miller Dep. 138-39.)

Older people were usually not hired, but younger people were hired. (Konter Aff. ¶ 6.) Young newly-hired employees easily found their way into Marinko's favored group, whereas newly-hired employees who were older had a difficult time at becoming favored by Marinko. (Konter Aff. ¶ 6.)

Finally, Plaintiff notes that in 2009, Marinko herself was terminated and the report that SRHS prepared upon Marinko's termination noted that her "supervisory skills were weak in that there were ongoing employee complaints about consistency of treatment amoung [sic] staff members." (ECF No. 23 Ex. 8.) Defendant responds that this evaluation does not say that Marinko was terminated as a result of ongoing staff complaints, much less that such complaints involved an issue of age discrimination. In fact, John Davidson testified that Marinko's position was eliminated in a budget reduction and that performance issues, discipline, complaints from staff and her involvement with RBC played no role in the decision. (Davidson Dep. at 33-35.)

Plaintiff's <u>Fuentes</u> prong two evidence is insufficient to establish a genuine issue of material fact as to whether age discrimination played a role in Plaintiff's termination. First, some of the alleged incidents cited (Marinko reduced the hours of some employees, Marinko denied some mileage reimbursements, Marinko's involvement with RBC, and Marinko's termination evaluation which made a note of her inconsistent treatment of staff members) do not raise an inference of age discrimination in any form. Second, Plaintiff's complaint that Marinko "targeted" certain employees does not specify any individuals, and this same failure applies to many of the statements in the affidavits, as explained below.

Third, the evidence that is specific does not support Plaintiff's claim. Lenzi testified at

length about Marinko's "favored" and "disfavored" groups of employees. Yet an examination of her testimony reveals that there is no correlation between age and whether an employee fell into the favored or disfavored group. Although the average age of the employees Marinko allegedly liked (31) was somewhat less than the average age of the employees she tolerated (37) and those she disliked (also 37), according to Lenzi, there are many younger employees in the tolerated and disliked categories.[18]

Moreover, Lenzi herself suggested that the groupings appeared to be related to whether the employees had previously worked in the Connections Program (employees Marinko liked) or the Foundations Program (employees Marinko disliked). These categorizations have nothing to do with age. Lenzi also testified that becoming a member of Marinko's favored group depended upon how much an employee "brown nosed." Again, whatever one might think of this as a management style, it has nothing to do with age discrimination.

Finally, the affidavits do not provide support for Plaintiff's claim, in part because they fail to name specific individuals and in part because, as Defendant notes, only one of the affiants (Sue Mapleton) was under the age of 40 at the time of the events they testify about, yet they consider themselves to be members of Marinko's disfavored group. Mapleton testified that she applied in writing for a full-time TSS position but Marinko gave it to a "younger employee" who had not even applied for it in writing and that Marinko tended to provided younger employees with more case assignments than older employees. (Mapleton Aff. ¶¶ 6-7.) But she has not identified who these employees were. Mabel Scafede relates that Marinko reprimanded her for not reporting to her personally when she could not make a shift yet she did not apply this rule to

---

[18] It should be noted that Lenzi's deposition was taken and the affidavits were all signed <u>after</u> Marinko's deposition was taken on June 9, 2010 and that Marinko was not asked any questions at her deposition about which employees she liked or disliked. Thus, she had no opportunity to respond to the categorizations advanced by Lenzi and the four affiants.

a member of the favored group. (Scafede Aff. ¶¶ 6-7.) But Scafede does not identify the individual involved and as Defendant notes, she was only 40 years old for the last four months of her employment, which ended in 2007. (Novelli Supp. Aff. ¶ 2.)[19] Shawn Konter states that he was a member of the disfavored group, but Defendant notes that he was 27 years old when he was hired in January 2000 and 34 when he left in May 2007. (Konter Aff. ¶ 5; Novelli Supp. Aff. ¶ 2.) Ronald Fagley, who was 28 when he was hired in 2003 and 30 when he left in 2005, testifies generally about "new, younger" workers receiving more and easier case assignments than long-term employees, but fails to cite the name of a single employee to support his testimony. (Fagley Aff. ¶¶ 6-8; Novelli Supp. Aff. ¶ 2.)

Defendant argues that "personal animosity, favoritism and cronyism are not illegitimate criteria for adverse employment actions." Kelly v. Retirement Pension Plan for Certain Home Office, Managerial and Other Employees of Provident Mutual, 209 F. Supp. 2d 462, 476 (E.D. Pa. 2002), aff'd mem., 73 Fed. Appx. 543 (3d Cir. Sep. 5, 2003). In fact, the issue is more complicated than Defendant suggests. See, e.g., Harris v. Hays, 452 F.3d 714, 721 (8th Cir. 2006) (Gibson, J., concurring) (noting that courts should be skeptical when employers cite "cronyism" as their reason for an adverse employment action when that practice is the equivalent of racial discrimination); Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 587-88 (1st Cir. 1999) (same), abrogated on other grounds, Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003).

Nevertheless, the Court need not resolve this issue because Defendant's legitimate non-discriminatory reason for terminating Plaintiff's employment is not cronyism. Rather, it cites the RIF and the decision to eliminate the MT-dedicated positions. The issue of cronyism arises only in Defendant's response to Plaintiff's contention that Marinko had certain employees she favored

---

[19]     Scafede indicates that she "was 43 years old as of June 21, 2010." (Scafede Aff. ¶ 1), but fails to note that this was three years after her employment with SRHS ended.

and some that she disfavored, all in situations having no connection to Plaintiff's termination.

The affidavits and Lenzi's deposition testimony may support the proposition that, in certain employment circumstances unrelated to Plaintiff's termination, Marinko favored certain employees over others for reasons other than merit and that these employees may have received favored status because they had worked in the Connections Program, because they "brown nosed," or for some other reason which remains unexplained. But they do not support Plaintiff's contention that Marinko displayed animus based upon employees' ages. In fact, because the affiants were under 40 at the time of the events in question and yet considered themselves to be members of Marinko's disfavored group, their evidence actually undermines Plaintiff's claim.

Plaintiff has failed to point to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non discriminatory reasons." <u>Fuentes</u>, 32 F.3d at 765. Therefore, Defendant's motion for summary judgment will be granted

_____
LISA PUPO LENIHAN
United States Magistrate Judge

Dated: March 24, 2011